In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-25-00208-CR
_____

**JASON GREGORY NOBLE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F22-39549**

**MEMORANDUM OPINION**

Jason Gregory Noble[1] ("Noble," "Defendant," or "Appellant") appeals his

judgment of conviction for aggravated assault-family violence, a first-degree

felony.[2] Tex. Pen. Code § 22.02(a), (b). After being indicted by a grand jury,

---

[1] The record reflects that Jason Gregory Noble is also known as Jason Noble and Jason Gregory Nobles.

[2] In our memorandum opinion we refer to the victim of the alleged aggravated assault-family violence by the initials KLK to protect the identity of the victim in this case, and we refer to KLK's wife as AK. *See* Tex. Const. art. I, § 30(a)(1)

Appellant entered a plea of "not guilty" to the charge. The guilt-innocence phase of the case was tried before a jury, and the jury found Jason Gregory Noble guilty of aggravated assault-family violence as stated in the indictment. Appellant waived his right to trial by jury for the punishment phase of the trial and elected for the trial court to determine punishment. The court assessed punishment at thirty-five years in the Institutional Division of the Texas Department of Criminal Justice. The trial court certified that Appellant has the right of appeal. Appellant timely filed a notice of appeal. Appellant also filed a motion for new trial in the trial court. On July 30, 2025, the trial court denied the motion for new trial.

Appellant raises two issues on appeal. In his first issue, Appellant argues that the trial court erred in denying his motion for new trial because he presented the trial court with newly discovered evidence favorable to him. In his second issue, Appellant contends that the trial court erred in denying his motion for new trial because KLK's affidavit, which he attached to his motion, supports his argument that the evidence produced at trial was false. For the reasons explained below, we overrule both issues and affirm the trial court's judgment.

---

(granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]"). *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982). It is undisputed that KLK and Noble resided in the same household at the time of the incident.

Indictment

In the indictment, the grand jury alleged that

the Defendant, [Noble] committed an offense hereafter styled the primary offense, on or about the 17TH day of MARCH, TWO THOUSAND AND TWENTY-TWO, and anterior to the presentment of this indictment, in the County of Jefferson and State of Texas, did then and there intentionally and knowingly and recklessly cause bodily injury to [KLK], hereafter styled the Complainant, a member of Defendant's household, by the use of a deadly weapon, namely, a handgun, by striking [KLK] in the head with a handgun.[3]

Summary of the Trial and Evidence

Because both issues on appeal pertain to the trial court's denial of the Defendant's post-trial motion for new trial, we only include a summary of the trial and evidence at trial with an emphasis on details pertaining to the issues on appeal.

Opening Statements

The State's attorney represented to the jury that the evidence would prove that Noble committed aggravated assault on KLK. The State informed the jury that they would hear testimony from a nurse practitioner and several law enforcement officers. The State argued that the testimony and physical evidence including medical records, statements, photographs, and bodycam footage would not match Noble's claim of self-defense in relation to KLK's physical condition, which required the use

---

[3] In the indictment the State also alleged a prior felony conviction of Arson-Second Degree, and a prior felony conviction for Aggravated Assault-Second Degree in enhancement paragraphs. The Defendant pleaded true to both enhancement paragraphs.

3

of a prosthetic leg and numerous medications. The State specifically mentioned that the jury would view evidence that would show KLK was either hit on his left cheek with a pistol or that Noble hit KLK with his fists to cause a blood cast-off on the wall by KLK's recliner.

The Defense counsel argued that testimony and evidence would show that Noble's actions were justified and reasonable. The Defense stated that while the evidence would show that Noble hit KLK, he did so when wrestling with KLK to disarm KLK, who was intoxicated, high on methamphetamines, paranoid, and had already fired a gun in the short time that Noble had resided with KLK and AK. The Defense emphasized that both KLK and AK had changed their version of events several times and that they had signed affidavits of nonprosecution.

<u>Evidence and Witnesses at Trial</u>

The State called five witnesses and introduced sixty-six exhibits during the trial. The witnesses for the State included David Millich (a Nurse Practitioner from the hospital where KLK was treated on the day of the alleged assault), Alton Baise (a neighbor of the victim and a law enforcement officer), Jake Benoit (the first Port Arthur police officer on the scene who responded to the call for backup), Marie Thibault (a retired crime scene investigator for the Port Arthur Police Department), and Aaron Taylor (another responding officer from the Port Arthur Police Department). The victim, KLK, and his wife, AK, did not testify, even though the

4

State issued subpoenas for both of them to be present at trial. The exhibits that were admitted into evidence included the medical records from the hospital where KLK received medical treatment on the evening of the assault, photos taken during the investigation including photos of the scene where the assault occurred, photos of KLK's injuries, photos of the Defendant taken by the officers, body camera footage from Officer Jake Benoit, and shell casings and bullet fragments obtained during the investigation. The State rested after presenting testimony from its final witness, Aaron Taylor. The defense recalled Jake Benoit in the defense case-in-chief, introduced some exhibits, and called Phillip Jones to testify during the punishment phase of the trial.

Testimony of David Millich

David Millich testified that he is a Nurse Practitioner, and he has an advanced master's degree in nursing, in addition to his bachelor's degree in nursing. Millich has worked in an emergency room setting for over sixteen years. Millich was working at the emergency room of the Medical Center of Southeast Texas on March 17, 2022, when he provided treatment to the victim, KLK. Before trial, Millich reviewed the medical records within State's Exhibit #1, which contains the medical records kept in the normal course of business of the Medical Center, which he attested were accurate and trustworthy. The Defendant did not object and the records were admitted into evidence. The records pertain to the emergency room visit of

KLK who presented to the emergency room on March 17, 2022, with injuries to his head, neck, and face, and Millich ordered CT scans of KLK's head to rule out a brain injury, as well as scans of his cervical spine and facial bones. Millich testified that by just looking at KLK on arrival "he was quite beat up[]" with "bruising all about the face, periorbital areas around the eyes[,] [h]is left ear was quite bruised[,] [and] had bruising to the left side of his face[.]" Millich was shown State's Exhibits #2 through 6, which he testified were photos that truly and accurately depicted the area of the injuries of KLK when Millich first saw and treated KLK at the hospital on March 17, 2022, except the photos showed some light bandages and underneath the bandages Millich saw the bruising. The photos show facial bruising, black eyes, and a laceration on the upper left cheek. One of the areas Millich remembers most about the case was "a perfectly circular lesion in the middle of the forehead with another circular lesion in the center of the outer ring." From the history KLK gave to Millich at the time of treatment, KLK told Millich he was hit, "you know, with fists and with a pistol, and that the handgun was pointed and jabbed at his forehead[,]" and Millich stated the circular pattern of the injury "represented the muzzle of an impression of a handgun[.]" Millich testified that the emergency room notes made during the initial triage state, "'Patient states he was assaulted by stepson just prior to arrival. Hit in head multiple times with fist and gun. Patient states he doesn't believe he lost consciousness, but he was dazed. Patient has lacerations to the face, swelling to the

6

left side of head and ear. PD' – is for police department – 'was on scene.'" Millich explained the triage nurse's notes. In the medical records it shows that KLK gave the triage nurse the following history:

> **ED Triage Note:** pt states he was assaulted by step son just pta, hit in head mult times with fist and gun, pt states he doesn't believe he lost consciousness but he was dazed, pt has lacerations to face and swelling to lt side of head and ear, pd was on scene[.]

Millich also testified about additional notes in the medical records where the record shows KLK described what had happened. For example, Millich agreed KLK said, "My son was attacking me while at home. He hit me with the barrel of the pistol and punched me a couple of times in the face and ear[.]" Millich also agreed that State's Exhibits #4 and #5 are close-up photos of what appears to be a circular pattern injury, and Millich testified the impressions show not only the outside of the barrel of the gun but also the inside of the barrel.

Testimony of Alton Baise

Alton Baise testified that he has over thirty years in law enforcement work with different law enforcement agencies. At the time of the incident in question, he was the Chief of Police for the Port Arthur School District, and his house is two houses to the left and across the street from [KLK]'s house in Port Arthur, Texas. Baise testified that he has known [KLK]'s family for a long time. Baise was at home on the evening of March 17, 2022, when his wife told him there was a woman outside who needed help. Baise went outside and found a woman asking for his help, and he

7

later learned the woman was A.K. (KLK's wife and Noble's mother). The woman appeared to be "very, very nervous…she was shaking[,] trembling" and she was "overwhelmed and appeared to be very excited—fear excitement, not joy excitement." The woman told Baise that her son was shooting inside the house and he had gone into a rage. The woman said that she and her son had struggled, and her son grabbed her, tore her clothes, and she ran. She also told Baise that her son was accusing her and her husband, KLK, of hiding cigarettes from him. She told Baise that her son told her that he was "going to get the gun[]" and as she was running out of the garage, she heard gunshots. Baise agreed that State's Exhibits #6 and #7 are accurate photos of the woman and they depict what she was wearing and show her clothes were torn, which was consistent with what she told Baise.

After speaking to the woman, Baise retrieved his vest, gun, flashlight, handcuffs and radio, and he called for backup. As Baise approached KLK's house, the garage door was raised; he carefully listened as he approached to see what he could hear; about thirty seconds later he heard the glass storm door open from the front of the house, and he looked around the corner and he saw a man later identified as Noble coming out of the door and walking onto the porch. Baise called out to the man and had him raise his hands and get on his stomach on the ground, and Baise handcuffed Noble. Baise (also known as A.B.) then called out to KLK to see if he was inside and if he was shot, but KLK did not respond at first, so Baise went inside

8

the house and called out again to KLK who answered, "Is that you, A.B.?" Baise asked if KLK had been shot and KLK told Baise he had not been shot. Baise could see KLK sitting in a recliner in the corner, and according to Baise, KLK was "shaking[.]" Baise further described what KLK looked like at that time:

> He's got blood streaming down his fingers and blood coming from his head and just blood everywhere on his lap, you know. I say, "You sure you're not shot?" He said, "I'm not shot." I said, "Just hang on, buddy. Hang on." I said, "I got -- I think an ambulance is on the way. I got help on the way. Hang on."

Baise also identified what is depicted in the photos that were taken of KLK and of Noble on the evening in question, which Baise said accurately depict the condition of each of them, and the photos were admitted into evidence. According to Baise, Noble had an injury to his hand, which was consistent with hitting someone. Baise explained to the jury that KLK has had health problems as long as Baise has known him, and the problems have worsened over the years. KLK's left leg had been amputated due to an infection, so at the time of the incident KLK had one prosthetic leg, and Baise would observe KLK use a wheelchair whenever KLK was outside with his dog. Baise asked KLK what happened and KLK told Baise that Noble "was going into a rage accusing him of hiding his cigarettes[]" and that "his son started punching him, and he thinks he hit him with a pistol once or twice. And then he walked about the house just shooting—shooting the gun about the house. And he shot a couple of times right close to where [KLK] was sitting." On cross-

9

examination, Baise agreed that he noted in his report that Officer Knowles told him, "Man, I don't know who was doing the shooting because we found the gun, but the clip was in [KLK]'s pocket."

Testimony of Jake Benoit

Officer Jake Benoit testified that on the date of this incident he was a police officer with the Port Arthur Police Department. The dispatcher received a call made by Chief Baise and Officer Benoit went to the scene. When Officer Benoit arrived, he saw Chief Baise had a white male handcuffed in the front yard and lying on his stomach. At that point, Officer Benoit asked Baise if anyone else was inside the residence or if anyone needed help and Baise told Benoit that an elderly gentleman was inside the living room and bleeding. Officer Benoit entered the house to check on KLK who was sitting in a recliner. State's Exhibits #2 through 6 were identified as photos taken of the elderly gentleman [KLK], but the photos showed what Benoit said is "a lot less" blood than when Officer Benoit first saw KLK. The EMTs were already on the scene and helping KLK when Officer Benoit arrived. Upon first speaking with KLK, Officer Benoit felt like KLK did not want to tell Benoit the full story. KLK acted like he wanted the police to leave, and KLK told Benoit he did not need assistance from the EMT. When Officer Benoit asked KLK what had happened, KLK told Benoit that he was punched by his son, and later he told Benoit he was not hit with any object.

10

Officer Benoit put Noble in his police car and later transported Noble to the station and photographed Noble at the station, and the photos were introduced as State's Exhibits #9 through 12. Officer Benoit was wearing a body camera at the scene, which he described as something like a cell phone that recorded everything, and a 2.5-minute segment from the body camera footage was played for the jury. The camera footage shows that when Officer Benoit arrived at the scene it was still daylight, and according to Officer Benoit, when he first observed KLK

> A. He had a large amount of blood coming from his face. He kept wiping his face, wiping his face. And when he would wipe it, I could see that he had a laceration to his cheek, but he also had a circular -- it was bleeding. It was a circular mark on the -- in between his eyes that was actually bleeding.
> Q. Kind of like what we see here in State's [Exhibit #] 40?
> A. Yes, sir.
> Q. Could you see that perfect circular type injury?
> A. Yes, sir.
> Q. And could you see the blood coming from that?
> A. Yes, sir.
> Q. What was your impression when you saw that?
> A. When I saw that knowing a gun's involved, that – in my opinion, that would be from someone taking a gun and physically punching somebody with the barrel of the front of it.

Officer Benoit testified that Noble told the police that he believed KLK was under the influence of narcotics. But Benoit testified that he did not see any indication that KLK was "under the influence." Blood spatter was found near the recliner where KLK was seated. Live bullets and spent shell casings were found on the floor, and there were some bullet holes. State's Exhibit #31 was introduced, and

11

Officer Benoit agreed it is a photograph of Noble's bedroom, and he agreed that it shows a pack of cigarettes on a table in Noble's bedroom.

Officer Benoit prepared a report, and in his report, he describes what Noble told him at the scene. According to the report, it was about 7:00 p.m. when the police first arrived on the scene. According to the report, after being "Mirandized," Noble told the officers that he had returned home from work around 3:45 p.m. that afternoon, and after he had returned home from work, Noble began drinking "Fireball whiskey."

> Q. So, let's kind of deal with this really one statement at a time and see if you found anything to support what was made. Okay? So, after the Mirandized -- I'm picking up on page 3 -- Mr. Noble told you that he returned home from work at about 3:45. You got called out at about 7:00 o'clock --
> A. Yes, sir.
> Q. -- right? He told you he entered the residence and began drinking Fireball whiskey.
> A. Yes, sir.
> Q. Do you remember a bottle of Fireball whiskey being found at the scene?
> A. Yes, sir.
> Q. That would indicate that that portion seems to be accurate?
> A. Yes, sir.

Appellant also told the officers that KLK was known to use narcotics and to fire the gun without concern for Noble's or his mother's safety. Noble said he called his boss, and his boss told him to leave. Noble then said he confronted KLK and attempted to retrieve the firearm for everyone's safety. Noble said he struggled with KLK and successfully managed to get the firearm away from KLK without hitting

12

KLK, he removed the magazine from the gun, cleared the round, and exited the house to smoke a cigarette. Noble said he then heard three shots from inside the house, and he reentered the home again to confront KLK and observed that the firearm was in KLK's hand. Noble said he attempted to take the firearm, and that he struck KLK on his left cheek with his elbow, causing a laceration, and he was able to take the firearm again from KLK and threw it across the room, and then Noble said he exited the residence again just as police arrived.

Officer Benoit went through the photographs and explained to the jury what was depicted in the photos, Exhibits 14 through 40, noting among other items the blood splatter next to the recliner where KLK was sitting, medication bottles, bullet holes, spent casings, and unfired rounds. Officer Benoit transported Noble to the police station.

Testimony from Marie Thibault

Crime Scene Investigator Marie Thibault testified that she processed both Noble and KLK for gunshot residue. Thibault also photographed KLK. Thibault explained that when she processed the crime scene, she placed little yellow cone markers, noting the location of evidence including fired shell casings, blood spatter, live rounds, and bullet holes. A 9-millimeter handgun was found between a box spring and a mattress. Bullet jacket fragments were found and marked. Some fragments were found in Noble's bedroom and Thibault thought that meant that a

13

gun was fired inside Noble's bedroom. A bottle of Fireball whiskey was found in the hallway bathroom, which she agreed offered support to part of what Noble said happened. The evidence was gathered and delivered by Thibault to the crime lab and processed by the lab. She took photos of Noble's hands and there were abrasions that he said came from work and installing insulation. According to Thibault, it is her understanding that KLK had washed his hands before the gunshot residue test. Thibault found a bullet hole in the floor. Fired shell casings were located in KLK's office area and also in the hallway that connects the bedroom and the office. No fingerprints were developed on any live or fired shell casings. KLK told the officers that the firearm was previously loaded by him with fifteen live rounds, and they were told that Noble had cleared at least two lodged bullets. State's Exhibit #58 shows where Thibault measured the length of the barrel of the gun found at the scene, and she testified that based on the measurements she took as depicted in State's Exhibit #58, the size was consistent with the size of the injury on KLK as depicted in State's Exhibit #4.

Testimony of Aaron Taylor

Officer Aaron Taylor of the Port Arthur Police Department testified that he was dispatched to the scene on the evening of the assault. Upon arrival, he was advised that KLK was inside the home, and he entered the home to speak with KLK. KLK told him that Noble tried to "kill him with a firearm and assaulted him[.]"

14

Officer Taylor observed injuries to KLK that he believed were consistent with KLK being punched and some injuries that appeared to be the same diameter as the barrel of a pistol. Three bullet holes were found in the wall of the living room. The firearm was ultimately found in KLK's bedroom under the mattress, which is where KLK explained he kept it. Two witness statements were obtained, one from KLK and one from AK.

KLK told Officer Taylor that the incident resulted from an argument between KLK and Noble over cigarettes and a lighter, that Noble had retrieved KLK's firearm from the bedroom, and Noble had fired it approximately seven times before entering the living room. KLK said that Noble attempted to fire twice in KLK's direction, but the firearm had malfunctioned. KLK also said that Noble had physically assaulted KLK with the firearm by pushing the pistol against KLK's head and punching him several times. Officer Taylor testified that the pistol's magazine was recovered from KLK, and it was in his pocket. KLK told the officer that Noble had then placed the pistol back under the mattress where it was kept.

AK gave a statement to Officer Taylor and explained that there was an argument over cigarettes and a lighter, and she found some matches for Noble who then entered the garage to calm down and smoke. She said that Noble continued to get angry, threw and broke an ashtray in the garage, grabbed her by the shirt, made a statement that he was going to kill KLK, and returned to the living room where

15

there was another argument. She went to the garage to clean up and then she heard three gunshots after which she ran to get Chief Baise's assistance. She advised Officer Taylor that at that point she believed Noble was possibly suicidal, thought he may have shot KLK, and potentially killed himself. When Officer Taylor spoke with AK, AK's shirt was torn, and that was consistent with being grabbed. Officer Taylor also found a broken ashtray in the garage. Officer Taylor did not observe anything indicating to him that KLK was intoxicated. State's Exhibit #67, a fourteen or fifteen minute portion of Officer Taylor's body camera footage, was admitted into evidence without objection and played to the jury. As the video was played for the jury, the State questioned Officer Taylor about what can be heard on State's Exhibit #67, when Chief Baise talked to KLK about what happened:

> Q. Okay. Do you -- did you hear in that portion [of] him having a conversation with Chief Baise about what took place?
> A. Yes, sir, he did.
> Q. Did you hear him make a response as to whether or not he was hit with the pistol?
> A. Yes, sir, he did.
> Q. And what response did you hear, sir?
> A. That he was struck with a pistol.
> Q. And did that fit with what you saw that day?
> A. Yes.

Additional Testimony of Jake Benoit

The defense recalled Officer Benoit to testify, and he testified about a supplemental police report prepared by Officer Moss who was unavailable to testify, and the supplemental report was admitted as Defense Exhibit #1. Benoit explained

16

that Officer Moss was present at the scene on March 17, 2022, and he prepared a report that noted on page two that "several people lived at this residence had previously admitted to shooting up drugs[.]" Part of Officer Moss's body camera footage was also admitted into evidence as Defense Exhibit #2 and then shown to the jury. The defense asked Officer Moss if KLK said a round was fired into the ceiling in KLK's bedroom, and Officer Benoit can be seen pointing at the ceiling in the bedroom where a bullet hole was found. Officer Benoit testified it was hard for him to understand what he said on the video, and he could not remember if he found a bullet hole in the ceiling of KLK's bedroom, but if he had noticed something he would have told the evidence technician who could have made that determination.

Closing Arguments in Guilt/Innocence

In its closing argument, the Defense argued that Noble acted reasonably under the circumstances, in that to protect both his and his mother's safety, he had to use desperate measures to get the gun away from KLK since he was shooting a gun while intoxicated, paranoid, and using drugs. The Defense reminded the jury that both KLK and AK had made inconsistent statements to law enforcement and were not present at trial.

The State summarized and reviewed the argued evidence and testimony and emphasized the evidence disputing Noble's claim of self-defense. The State argued the State had proven beyond a reasonable doubt that Noble committed an aggravated

17

assault on March 17, 2022, by intentionally, knowingly or recklessly causing bodily injury to KLK, a member of his household, by striking him with a handgun. State's Exhibit #2, reflecting KLK's facial injury, was also shown to the jury. The State reminded the jury of the videos which showed the amount of blood on KLK's face, and the State explained that the medical records reflect that KLK stated he was hit in the head multiple times with a fist and a gun by Noble. The State addressed KLK and AK's absence, mentioned "family dynamics[]" and noted that their presence was not required to prove up the aggravated assault.

Sentencing

After the jury returned a verdict of guilty, the sentencing phase of the trial was presented to the court without a jury. At the sentencing phase of the trial, the defense argued that Noble and the victim had reconciled and forgiven each other, and that in addition to signing "two nonprosecution affidavits[,]" KLK has "consistently held the position that he did not want Mr. Noble to be punished" for this incident. The defense also argued that Noble had lived in a violent home, he had prior convictions, suffered from mental health, failed to take his medications, and had not had proper care and treatment.

The defense called Phillip Jones, Noble's friend and boss, who testified during the punishment phase of the trial and stated that he had known Noble since they were children. Jones provided background and testimony related to Noble's family, work

18

history, a history of physical abuse by his father, and that when Noble was about 27 years old and in prison for another crime, Noble's father committed suicide. He explained that he believed from what he had been told that KLK had a history of drug use, including using methamphetamines. He testified that AK contacted him on the night of the incident asking that he come over to calm Noble down because KLK had "fired off a gun and then Jason tried to take it from him and hit him, hit him with his gun and all that."

The State explained to the court that after the incident, KLK had given the State an affidavit of nonprosecution, but KLK told them when he gave it to them, that the accusations he had made against Noble had occurred and KLK said, "the only reason why I'm doing this is because my wife's making me do this."

Motion for New Trial

After the trial and after sentencing, Noble's appellate attorney filed a Motion for New Trial. In the motion, Noble's attorney argued that he was provided with an affidavit from the complaining witness of the alleged crime who did not testify at trial and that the affidavit presents what he described as newly discovered evidence that the defendant acted in "self-defense and is not guilty[]" and the evidence is "mitigating." Additionally, Noble's attorney argued the evidence presented to the jury was false because KLK was "never hit in the head with a firearm." The trial court denied the motion for new trial.

The affidavit of KLK that is attached to the motion for new trial states as follows:

"My name is [KLK]; I am over the age of eighteen (18); I am fully competent to make this affidavit; I have personal knowledge of the facts stated herein and they are all true and correct."

"My name is [KLK]. I can be reached at (409) []. I am the complaining witness in the above-referenced and numbered cause.

On or about March 17, 2022, Jason Noble and I got into a fight over a pistol. I did not want to voluntarily give it to him. The pistol accidently discharged in the living room while we were struggling over it. While fighting over the gun, the barrel was pointed at Mr. Noble's stomach and he struck me with his left forearm on my forehead in an attempt to free the pistol. Mr. Noble took the pistol away from me; he cleared the barrel; released the magazine from the pistol; and threw down onto the floor.

I am asking that this case be dismissed because I was never hit in the head with a firearm by Jason Noble.

This is a voluntary act on my part and I have not been given anything of value or pressured or threatened in any way in exchange for any testimony."

Standard of Review and Applicable Law

We review a trial court's ruling on a motion for new trial under an abuse of discretion standard of review. *See Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). The trial court is the sole judge of the witnesses' credibility on a motion for new trial with respect to affidavits and live testimony. *See Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013). Accordingly, we must afford almost total deference to the trial court's express and implied findings of historical facts as well as mixed questions of law and facts that turn on an evaluation of credibility and

20

demeanor. *See id.* We apply the same deferential review to a trial court's determination of historical facts based solely on affidavits, regardless of whether the affidavits are controverted. *See id.*; *Splettstosser v. State*, No. 09-23-00339-CR, 2025 Tex. App. LEXIS 9149, **81-82 (Tex. App.—Beaumont, Nov. 26, 2025, pet. ref'd) (mem op., not designated for publication). We must also view the evidence in the light most favorable to the trial court's ruling. *Biagas v. State*, 177 S.W.3d 161, 170 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

The Texas Code of Criminal Procedure article 40.001 provides that "[a] new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." Tex. Code of Crim. Proc. Ann. Art. 40.001. To be entitled to a new trial for newly discovered evidence, the defendant must show that the new evidence was recently discovered, and the evidence must be material. *Id.* The appellant must show that (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *Carsner v. State*, 444 S.W.3d 1, 2-3 (Tex. Crim. App. 2014). A motion for new trial cannot be granted unless the defendant shows entitlement to one under the law. *State v. Thomas*, 428 S.W.3d 99, 104 (Tex.

21

Crim. App. 2014). When the defendant fails to establish any one of the four necessary elements as outlined above, then the trial court should deny the motion.

While it is true that the recantation of material testimony may warrant a new trial, *see Keeter v. State*, 74 S.W.3d 31, 37-38 (Tex. Crim. App. 2002), there are exceptions to this rule. One such exception arises when the record provides the trial court "some basis for disbelieving the testimony[]" of the recanting witness. *Id.* at 38.

Analysis

Because both of Appellant's issues pertain to the motion for new trial, we address them together. Noble argues that the affidavit he attached to his motion for new trial is "new evidence" and that it demonstrates that the evidence presented at trial was "false." Applying an abuse of discretion standard of review, considering that the trial court is the sole judge of the witnesses' credibility on a motion for new trial with respect to the affidavit, and considering the evidence that was submitted in the trial court during the trial, we conclude that the trial court did not abuse its discretion in denying the motion for new trial. *See Coyler*, 428 S.W.3d at 122; *Okonkwo*, 398 S.W.3d at 694.

The trial court could have concluded that the information in the affidavit was not newly discovered evidence that was unknown or unavailable. The record before the trial court shows that the statements made in the affidavit were not new or

22

unknown. In fact, the record reflects that the defense attorney was aware during the opening statement of the guilt-innocence phase of the trial, as well as during the punishment phase of the trial, that KLK had filed an affidavit of nonprosecution and the defense even argued during punishment that they had "reconciled" or "forgiven" each other for what happened. Additionally, the defense made the same argument to the jury that Noble had struggled with KLK to wrestle the gun away from KLK and that he had hit KLK with his elbow but not with the gun.

Additionally, the trial court could have concluded that the affidavit was not "probably true" because the statements in the affidavit are contradicted by the evidence in the record. The trial court could have disbelieved the affidavit given the statements KLK made to hospital personnel, to the investigating officers, to Chief Baise, and that it is contrary to the physical evidence. Here, the record contains evidence of statements made by KLK and AK immediately after the events in question describing what happened, statements made by KLK to the hospital personnel, descriptions of the injuries sustained by KLK in the medical records, testimony from Chief Baise and the investigating officers and the crime technician, evidence collected at the scene, as well as photographs depicting the unique, barrel-shaped wound on KLK's forehead. We conclude that the record provides some basis for the trial court to disbelieve KLK's affidavit and recantation. Because the record presented the trial court with circumstances that cast doubt into the victim's

23

recantation, we cannot say the trial court abused its discretion in denying the motion.

*See Keeter*, 74 S.W.3d at 39. We overrule both issues.

AFFIRMED.


LEANNE JOHNSON
Justice

Submitted on August 3, 2026
Opinion Delivered August 12, 2026
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.